UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| QIUSHA MA, et al., | ) | CASE NO. 1:17CV2056 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| BON APPETIT MANAGEMENT CO., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is defendant Bon Appetit Management Company's ("Bon Appetit") motion for summary judgment (Doc. No. 28 ["Mot."]). Plaintiffs filed their opposition (Doc. No. 30 ["Opp'n"]) and defendant filed a reply (Doc. No. 33 ["Reply"]). For the reasons discussed herein, defendant's motion for summary judgment is GRANTED.

I.   BACKGROUND

Plaintiff Qiusha Ma ("Ma") is a tenured professor of Chinese at Oberlin College ("Oberlin") in Oberlin, Ohio. (Doc. No. 28-4 ["Ma Dep."] at 380.[1]) Plaintiff Nengli Shi ("Shi") is Ma's husband. (*Id.* at 381–82.) Oberlin contracted with defendant Bon Appetit to manage Oberlin's food service employees and food service program at Oberlin dining halls, including Stevenson Dining Hall. (Doc. No 28-3 ["Mgmt. Agree."]; 28-7 ["Krasnevich Dep."] at 641.)

---

[1] All page number references are to the page identification number generated by the Court's electronic docketing system.

On October 16, 2015, a moveable wall partition in Oberlin's Stevenson Dining Hall came off the track from which it was suspended from the ceiling. (Doc. No. 28-5 ["Nemeth Dep."] at 516–18; Krasnevich Dep. at 649.) A Bon Appetit employee filed a maintenance request with Oberlin's maintenance staff to fix the broken wall partition. (Nemeth Dep. at 516–18; Krasnevich Dep. at 649.) Members of Oberlin's maintenance staff removed the broken wall partition and leaned it against a permanent exterior wall in the rear corner of Stevenson Dining Hall. (Krasnevich Dep. at 649.) As of the morning of November 6, 2015, the broken wall partition had not been fixed and remained leaning against the rear exterior wall in Stevenson Dining Hall. (*Id.* at 650–51.)

On November 6, 2015, Ma went to Stevenson Dining Hall to have lunch with students in the Chinese Language Program. (Ma Dep. at 392–93.) At some point that day, between morning and lunch, an unknown individual moved the broken wall partition and propped it up next to other moveable wall partitions in the cafeteria. (Krasnevich Dep. at 650–51.) Ma sat down at a table next to where the broken wall partition had been propped against the other moveable wall partitions. (Ma Dep. at 396–97.) A student sitting on the other side of the broken wall partition accidentally hit the broken wall partition, causing it to fall onto Ma as she sat. (Krasnevich Dep. at 650–51.) Ma sustained serious and permanent injuries. (Ma Dep. at 408–438.)

On October 2, 2017, plaintiffs filed their complaint against Bon Appetit. In their complaint, Ma brought a claim for negligence and Shi brought a derivative claim for loss of consortium. Following the completion of discovery, Bon Appetit filed the present motion for summary judgment. Plaintiffs filed their opposition, and defendant filed a reply.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of, or in opposition to, a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, the Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus,

in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The nonmoving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The nonmoving party must show "more than a scintilla of evidence" to overcome summary judgment; it is not enough for the nonmoving party to show that there is some "metaphysical doubt" as to material facts. *Id*.

### III. DISCUSSION

In its motion for summary judgment, Bon Appetit claims that Ma's negligence claim must fail because (1) Bon Appetit did not owe Ma a duty; (2) even if Bon Appetit did owe Ma a duty, it did not breach any such duty; and (3) Ma's negligence claim is barred by Ohio's Worker's Compensation Act. Further, Bon Appetit claims that Shi's derivative loss of consortium claim fails as a matter of law because Ma's negligence claim fails.

#### 1. **Negligence**

Under Ohio law,[2] to succeed on a negligence claim, plaintiff must prove: 1) the existence of a duty; 2) breach of that duty; and 3) that the breach was the proximate cause of her injury. *Asad*

---

[2] The Court applies Ohio choice of law rules because the case was brought in federal court in Ohio pursuant to diversity jurisdiction. *Charash v. Oberlin Coll.*, 14 F.3d 291, 296 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*,

4

*v. Continental Airlines, Inc.*, 328 F. Supp. 2d 772, 781 (N.D Ohio 2004) (citing *Hester v. Dwivedi*, 733 N.E.2d 1161, 1164 (Ohio 2000)). The threshold question—the existence of a duty—is a question of law for the Court to determine. *Id.* (citing *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989)). A duty is a legal obligation for one person to act for the benefit of another person due to the relationship between them. *Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934, 942 (N.D. Ohio 2005).

**Nonfeasance or Misfeasance**

Negligence actions may be premised on either acts of omission (nonfeasance) or acts of commission (misfeasance). *Asad*, 328 F. Supp. 2d at 782. Ohio law recognizes the distinction. *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 673 N.E.2d 1311, 1319 & n.2 (Ohio 1997). Nonfeasance usually involves a special relationship and the "failure to do an act that a person is under a duty to do and that a person of ordinary prudence would have done under the same or similar circumstances, or the failure to take action to protect another from harm." *Asad*, 328 F. Supp. 2d at 782 (citing 57 AM. JUR.2D *Negligence* § 13). "[M]isfeasance, on the other hand, arises from 'the improper doing of an act that a person might lawfully do or active misconduct that causes injury to another.'" *Id.* (citing 57 AM. JUR.2D *Negligence* § 13).

Put another way, Ohio law imposes a duty on everyone to refrain from active misconduct that causes an injury to another, but it does not impose a general duty to take affirmative action to aid or protect another. *Estates of Morgan*, 673 N.E.2d at 1319. An affirmative duty to aid or protect another only arises when a "special and definite relationship" exists between the parties. *Jackson v. Forest City Enters., Inc.*, 675 N.E.2d 1356, 1358 (Ohio Ct. App. 1996). Examples of special and

---

313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)). Further, Ohio choice of law rules direct the Court to apply Ohio tort law to the instant action. *See id.* at 296–99.

definite relationships include: (1) common carrier and its passengers, (2) innkeeper and guests, (3) possessor of land and invitee, (4) custodian and individual taken into custody, and (5) employer and employee. *Id.*

Here, there is no evidence that Bon Appetit actively created the harm that led to Ma's injury, and Ma does not argue that Bon Appetit did. (Mot. at 250 ([A]n unknown individual or individuals moved the broken wall partition . . . and leaned it up against a wall partition that was properly attached to the ceiling."); Opp'n at 788 ("[I]t remains unknown who moved the wall partition on November 6, 2015 to the position from which it fell.").) Thus, Ma advances her negligence claim based on nonfeasance. As such, Ma must first establish the existence of a special and definite relationship.

**Landowner-Invitee Relationship**

Ma alleges a landowner-invitee relationship existed between the parties at the time of the incident. Bon Appetit posits that no such relationship existed because Bon Appetit did not own the dining hall, did not lease the dining hall, and otherwise did not exercise any control over the premise of the dining hall.

Under Ohio law, a plaintiff's status on a defendant's premises determines the scope of the legal duty owed (trespasser, licensee, or invitee). *Pelland v. Wal-Mart Stores, Inc.*, 282 F. Supp. 3d 1019, 1023 (N.D Ohio 2017) (citing *Shump v. First Cont'l-Robinwood Assocs.*, 644 N.E.2d 291, 294 (Ohio 1994)). As defined by Ohio law, a business invitee is a person who is on the premises of another by invitation, express or implied, for some purpose which is beneficial to both persons. *Light v. Ohio Univ.*, 502 N.E.2d 611, 613 (Ohio 1986).

Here, the parties do not dispute that Ma was a business invitee in Stevenson Dining Hall at the time of the incident. (Opp'n at 784 (citing the business invitee premise liability standard as the

6

appropriate legal standard in this case); Mot. at 251 (same).) She was present to purchase and eat lunch in the dining hall. Therefore, the Court will analyze Ma's claim under business invitee case law.

**Sufficient Control of Premises**

Under Ohio law, a land possessor or occupier owes business invitees on their premises a duty of "ordinary care." *Dryer*, 383 F. Supp. 2d at 942. "Ordinary care" means that the land possessor or occupier is required to maintain the premises in a safe condition, eliminating any unreasonable risks of harm to invitees. *Id.*

In many cases, the land possessor or occupier is also the owner of the premises. However, where a party other than the owner possesses the premises, the possessor or occupier, and not the owner, owes the applicable legal duty to the entrant. *Shump*, 655 N.E.2d at 295. For the possessor or occupier to owe a legal duty instead of the true owner, the possessor or occupier must have sufficient control of the premises. *Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 704 (Ohio 1995) ("It is fundamental that to have a duty to keep premises safe for others one must be in possession and control of the premises."); *Fryberger v. Lake Cable Recreation Ass'n*, 533 N.E.2d 738, 741 (Ohio 1988) ("Liability for injuries arising from the defective condition of property is an incident to occupation or control of the property."). Sufficient control is required as a predicate to liability because the one with control of the premises is in the best position to diminish danger to invitees. *Simpson*, 652 N.E.2d at 702. As Ohio courts have held consistently, the test for whether a land occupier possesses sufficient control is whether the occupier has "the power and right to admit people to the premises and to exclude people from it." *See, e.g.*, *id.* at 704; *Wills v. Frank Hoover Supply*, 497 N.E.2d 1118, 1120 (Ohio 1986); *Payne v. Ohio Performance Acad., Inc.*, 98 N.E.3d 1078, 1086 (Ohio Ct. App. 2017). Sufficient control can be held jointly by two parties, so

long as both parties satisfy the test to admit and exclude. *Fryberger*, 533 N.E.2d at 741 (finding the lake owners' association liable because the association had, among other factors, at least some power and right to admit or exclude).

A common instance where a land occupier's duty replaces a landowner's duty occurs in cases of commercial leases. In Ohio, a commercial lessee (tenant) becomes responsible for the condition of premises which they control under the terms of the lease. *Hendrix v. Eighth & Walnut Corp.*, 438 N.E.2d 1149, 1151 (Ohio 1982) (finding lessee liable for hazards on premises because lease transferred occupation and control of leased premises to lessee). The commercial lessor (landlord) is liable for hazards on the leased premises only if the lessor retains some control of the premises. *Stackhouse v. Close*, 94 N.E. 746 (Ohio 1911) (lessor retained control over the premises by the terms of the lease). Again, as the premise liability case law for leased commercial premises reinforces, the question of legal duty focuses on control of the premises because the controller is in the best position to remedy hazards. "Without evidence of control, the 'lessor is not liable for injuries to a third party.'" *Washburn v. Lawrence Cty. Bd. of Comm'rs*, 720 F.3d 347, 352 (6th Cir. 2013) (applying Ohio law) (quoting *Frank Hoover Supply*, 497 N.E.2d at 1120).

Here, Ma contends that Bon Appetit had sufficient control over Stevenson Dining Hall because it had the power and the right to admit persons to or exclude persons from the dining hall. Specifically, Ma contends that Bon Appetit exercised control to admit or exclude persons because its employees had keys to Stevenson Dining hall, opened the doors each morning, closed the doors each night, could exclude trespassers, reserved rooms for diners, and could close the dining hall if there was a dangerous condition present. (Opp'n at 785–86.)

The fact that Bon Appetit employees were tasked with opening the doors each morning and closing the doors each night does not amount to the power and the right to admit or exclude.

8

Bon Appetit employees were simply following instructions from Oberlin. Oberlin sets the hours of Stevenson Dining Hall. (Mgmt. Agree. at 274, 294 (listing the hours of operation for each dining hall and directing Bon Appetit to provide services during those hours).) As part of its agreement with Oberlin, Bon Appetit's employees opened and closed the doors at the Oberlin-determined time each day. (Krasnevich Dep. at 647.)

Moreover, Oberlin determined who had access to the cafeteria by requiring payment with an Oberlin-approved payment method. (Mgmt. Agree. at 289 (listing ways to pay for entrance to Stevenson Dining Hall); Krasnevich Dep. at 656.) Further, Oberlin employees checked for acceptable methods of payment at the entrance of Stevenson Dining Hall. (Krasnevich Dep. at 656.) To the extent that anyone attempting to enter the Stevenson Dining Hall was admitted or denied, it was determined by Oberlin and Oberlin employees.

It is true that persons wishing to reserve a portion of Stevenson Dining Hall for a private event contacted Bon Appetit for the reservation. (Doc. No. 28-6 ["Klancar Dep."] at 593–94.) However, Bon Appetit used Oberlin's room reservation system to determine availability and Oberlin employees prepared the cafeteria for the private event, specifically by moving the wall partitions to create a private, reserved space. (Klancar Dep. at 593–96.) Again, to the extent that persons were able to reserve Stevenson Dining Hall for a private event, it was at the discretion of availability that Oberlin listed in their room reservation system and it was Oberlin that created the private space.

Lastly, Ma contends that Bon Appetit had the power to exclude persons from the cafeteria if there was a dangerous condition present. (Opp'n at 786.) To support her claim, Ma cites to the deposition of Mark Sustarsic ("Sustarsic"), a Bon Appetit manager assigned to Stevenson Dining Hall at the time of the incident. (*Id.*) However, review of Sustarsic's deposition and other relevant

9

portions of the record reveal Ma's claim is misleading. Sustarsic was the Bon Appetit manager who placed a work order on November 8, 2014, with Oberlin's maintenance staff to fix the at-issue wall partition. (Doc. No. 28-8 ["Sustarsic Dep."] at 707.) His deposition provides:

> Q: Well, what did you do to make sure that the room was safe between the time that you submitted the work order and the time that it was going to be repaired?
>
> A: I reported the work order need.
>
> Q: Okay. But in the meantime you just left the wall hanging there by the one peg?
>
> A: **There was nothing else I could do.**
>
> Q: Could you have closed the room, for example, while you were waiting for the moveable wall to be fixed?
>
> A: Possibly.

(Sustarsic Dep. at 708 (emphasis added).)

Elsewhere in the record, the fact that all Bon Appetit employees could do was submit a work order to Oberlin—even in an emergency—is reemphasized. John Klancar, Bon Appetit's director of operations at Oberlin, reveals in his deposition when asked about emergency work orders:

> Q: If you noticed something that in your view in a dining room was dangerous and jeopardized the safety of the patrons, you would immediately contact Oberlin College to bring that to their attention, wouldn't you?
>
> . . .
>
> A: Yeah, I mean if, like I said, if it's gut-shot. If I saw something that I felt was really unsafe and could do instant damage right then and there, I'd pick up the phone and call Oberlin College—or call Facilities.
>
> . . .
>
> A: **And then it would be out of my hands.**

(Klancar Dep. at 575–76 (emphasis added).)

If Bon Appetit observed a dangerous condition in Stevenson Dining Hall, they had to notify Oberlin, who would dispatch their maintenance staff to make necessary remedies. (Mgmt. Agree. at 277; Klancar Dep. at 553–54.) If Bon Appetit determined the condition was an emergency, Oberlin directed Bon Appetit to submit an emergency maintenance request. (Klancar Dep. at 575–76.) There is no evidence that Bon Appetit had authority to exclude persons from Stevenson Dining Hall if they deemed a condition dangerous. There is no evidence in the record that Bon Appetit could, or ever did, exclude persons from Stevenson Dining Hall because of a dangerous condition.

The management agreement further reveals that Bon Appetit lacked any power or right to admit or exclude certain persons from Stevenson Dining Hall. The management agreement states, "Oberlin authorized representatives shall have access to all food service areas **at all times**." (Mgmt. Agree. at 273 (emphasis added).) And that, "Oberlin may make reasonable regulations with regard to the use and **occupancy** of the Premises with which Bon Appetit **will comply** as soon as possible after written notice." (*Id.* (emphasis added).) Oberlin decided who was admitted to Stevenson Dining Hall, not Bon Appetit.

Bon Appetit could not even decide which of its own employees had access to Stevenson Dining Hall without Oberlin's input. Pursuant to the management agreement, Oberlin participated in the hiring of Bon Appetit's management and administrative office employees. (*Id.* at 276.)

To combat Bon Appetit's lack of control over admittance and exclusion, Ma contends that the Ohio Supreme Court's decision in *Fryberger* stands for the proposition that the right to admit or exclude persons from the premises is just one factor in determining whether an occupier had sufficient control. (Opp'n at 786). However, Ma does not cite to any Ohio case law that interprets *Fryberger* this way. Contrarily, Ohio courts, and the Sixth Circuit, consistently have construed *Fryberger* as accepting that more than one person or entity can control premises, while reinforcing

the proposition that control requires the power and the right to admit persons to or exclude persons from the premises. *Currier v. Penn-Ohio Logistics*, 931 N.E.2d 129, 134-35 (Ohio Ct. App. 2010) (discrediting any argument that the right to admit and exclude is not the sole test for control); *Monnin v. Fifth Third Bank of Miami Valley, N.A.*, 658 N.E.2d 1140, 1151 (Ohio Ct. App. 1995) ("*Fryberger* announces no new rule on control different from that in other cases."); *Washburn*, 720 F.3d at 352 ("The key to [the control] test is whether the lessor has the ability to admit or exclude people from the premises because 'such rights are attributes of ownership.'" (quoting *Cooper v. Roose*, 85 N.E.2d 545, 549 (Ohio 1949))). Here, Bon Appetit did not share any power or any right to admit persons to or exclude persons from Stevenson Dining Hall.

Even if this Court accepted Ma's interpretation of *Fryberger*, Bon Appetit displays no other indicia of control over Stevenson Dining Hall. While Bon Appetit was physically present in Stevenson Dining Hall to manage the food service program and the Oberlin food service employees, its presence does not amount to possession and control over Stevenson Dining Hall. Pursuant to the management agreement, Oberlin retained responsibility for the condition of the Stevenson Dining Hall premises and the condition of the equipment therein. (Mgmt. Agree. at 277.) Moreover, Bon Appetit did not own anything in Stevenson Dining Hall. (*Id.*) All the equipment, tables, chairs, wall partitions, et cetera belonged to Oberlin.[3] (*Id.*)

It is true that Bon Appetit was required to inspect the dining hall every day to ensure that the dining hall was safe and sanitary. (Opp'n at 784; Mgmt. Agree. at 277.) However, Bon Appetit was not responsible for completing any maintenance or repairs in the dining hall. (Mgmt. Agree. at 277.) As discussed, if a Bon Appetit employee noticed something in need of repair, they were

---

[3] It is true that Bon Appetit possessed and occupied offices within Stevenson Dining Hall. (Opp'n at 786.) However, the furniture and equipment within those offices belonged to Oberlin. (Mgmt. Agree. at 279.) Moreover, the incident did not take place within Bon Appetit's offices, and any possession or control of the offices does not mean Bon Appetit possessed or controlled the cafeteria area of Stevenson Dining Hall.

instructed to notify the Oberlin maintenance staff for assistance. (Mgmt. Agree. at 277; Klancar Dep. at 553–54.) Oberlin maintenance staff was responsible for remedying any issue. (Mgmt. Agree. at 277.)

Further, this case does not involve a lessee's or lessor's duty to protect business invitees. To be sure, Bon Appetit did not lease Stevenson Dining Hall from Oberlin. In fact, the management agreement specifically stated that the management contract was not a lease of any kind. (Mgmt. Agree. at 273.) Specifically, the management agreement provided that, "[n]either this Agreement nor Bon Appetit's occupancy of the [p]remises [Stevenson Dining Hall] shall constitute a lease or license of all or a portion of the [p]remises to Bon Appetit." (*Id.*) Bon Appetit did not have control over Stevenson Dining Hall as a lessee.

Examining all the facts in the light most favorable to the nonmoving party, there is no evidence to support a finding that Bon Appetit had the power and the right to admit persons to or exclude persons from Stevenson Dining Hall. Thus, there is no evidence to support a finding that Bon Appetit possessed the requisite level of control necessary to render it liable as a land occupier to business invitees at Stevenson Dining Hall. As such, there is no landowner-invitee relationship between Bon Appetit and Ma.

**No General Affirmative Duty To Protect**

Absent a landowner-invitee relationship, there is no special and definite relationship between Bon Appetit and Ma. Absent any special and definite relationship between Ma and Bon Appetit, Bon Appetit does not owe Ma any affirmative duty to protect her from a partition wall falling on her in a cafeteria. Thus, Ma's negligence claim based on nonfeasance fails because there

is no special or definite relationship between her and Bon Appetit, and, as such, Bon Appetit did not owe Ma any duty of protection from the falling wall partition.

### 2. Ohio Workers' Compensation Act

Because the Court grants defendant's motion for summary judgment on the basis that Bon Appetit did not owe Ma any affirmative duty, the Court need not, and will not, address whether Ma's negligence claim is barred by Ohio's Workers' Compensation Act.

### 3. Derivative Loss of Consortium Claim

Under Ohio law, "loss of consortium claims are derivative actions which depend on the existence of a primary cause of action." *Loomis v. Medtronic, Inc.*, No. 1:04CV0499, 2005 WL 1828763, at *6 (N.D. Ohio Aug. 1, 2005) (citing *Gearing v. Nationwide Ins. Co.*, 665 N.E.2d 1115, 1120 (Ohio 1996)). Because this Court grants Bon Appetit's motion for summary judgment on Ma's negligence claim, Shi's derivative loss of consortium claim must also be decided as a matter of law in Bon Appetit's favor. As such, Shi's loss of consortium claim fails.

## IV. CONCLUSION

For the reasons set forth herein, defendant's motion for summary judgment is GRANTED. This case is dismissed.

**IT IS SO ORDERED**.

Dated: November 28, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**